## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN COLLEGE OF<br>EMERGENCY PHYSICIANS<br>2121 K. Street, N.W., Suite 325<br>Washington, DC 20037<br><br>         Plaintiff,<br><br>   v.<br><br>SYLVIA M. BURWELL, Secretary of the<br>United States Department of Health and<br>Human Services<br>200 Independence Avenue, S.W.<br>Washington, DC 20201<br><br>and<br><br>THOMAS E. PEREZ, Secretary of the<br>United States Department of Labor<br>200 Constitution Ave., N.W.<br>Washington DC 20210<br><br>and<br><br>JACOB J. LEW, Secretary of the United<br>States Department of the Treasury<br>1500 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20220<br><br>       Defendants. | Case No.  1:16-cv-913 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, the American College of Emergency Physicians ("ACEP") states as follows:

## I.        INTRODUCTION

1.        This is a civil action brought to obtain declaratory and injunctive relief to halt

implementation of a final rule issued jointly by the United States Department of Health and

Human Services ("HHS"), the United States Department of Labor ("DOL"), and the United

States Department of the Treasury ("DOT") (collectively, the "Departments").  The

Departments' rule, codified in identical form at 26 C.F.R. § 54.9815–2719A(b)(3), 29 C.F.R. §

2590.715–2719A(b)(3), and 45 C.F.R. § 147.138(b)(3), is invalid because it does not ensure a

reasonable payment for out-of-network emergency services as required by statute, and the

Departments did not respond meaningfully to ACEP's concerns about the serious deficiencies of

the regulation.

     2.     When a person is in a car accident, suffers a heart attack, or is otherwise seriously

ill or injured, he or she is usually transported to the nearest emergency department and treated by

an emergency physician.  The emergency physician will treat the patient without regard to the

patient's ability to pay, both because it is the physician's professional duty and because federal

law requires stabilizing treatment for emergency medical conditions.

     3.     When the patient has health insurance, the emergency physician is often not a

member of the insurer's contracted network of providers.  The nation's critically important

network of emergency room services cannot be maintained unless emergency physicians receive

adequate payment for these "out-of-network" emergency medical services.

     4.     If a health insurer covers hospital emergency services, the Patient Protection and

Affordable Care Act requires that the insurer also cover out-of-network emergency services.

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10101(h), 124 Stat. 119,

888–90 (2010) (codified at 42 U.S.C. § 300gg-19a (2014)) (the "Affordable Care Act" or

"ACA").  The ACA forbids insurers from imposing coverage limitations on out-of-network

emergency services that are more restrictive than any limitations imposed on in-network

emergency services.  42 U.S.C. § 300gg-19a(b)(1)(C)(ii).  The ACA also mandates equal patient

cost-sharing for in-network and out-of-network emergency services.  *Id.*

5.      In 2010, the Departments issued an interim final rule with comment period to implement the ACA's out-of-network emergency services provisions.  Patient Protection and Affordable Care Act: Preexisting Condition Exclusions, Lifetime and Annual Limits, Rescissions, and Patient Protections, 75 Fed. Reg. 37,188 (June 28, 2010) (codified at  26 C.F.R. pt. 54; 29 C.F.R. pt. 2590; 45 C.F.R. pt. 147).  The interim final rule established a "greatest of three" methodology for determining payment for out-of-network emergency services in which the insurer must pay the greatest of the following: 1) the insurer's in-network amount; 2) the usual, customary, and reasonable ("UCR") amount; or 3) the Medicare amount.  *Id.* at 37,194.  In almost all instances, the highest of these three amounts will be the UCR amount.  However, insurers have historically understated and prevented public verification of the UCR amounts.

6.      Plaintiff ACEP raised these transparency and accuracy concerns with the Departments in correspondence and meetings over the course of the next four years.  ACEP requested that the Departments require insurers to determine UCR amounts using transparent, publicly verifiable data.  The Departments refused to modify the regulation and issued the rule in final form on November 18, 2015, without requiring transparent, verifiable data to calculate UCR amounts.  Final Rules for Grandfathered Plans, Preexisting Condition Exclusions, Lifetime and Annual Limits, Rescissions, Dependent Coverage, Appeals, and Patient Protections Under the Affordable Care Act, 80 Fed. Reg. 72,192 (Nov. 18, 2015) (codified at  26 C.F.R. pt. 54; 29 C.F.R. pt. 2590; 45 C.F.R. pt. 147) (the "Final Rule").  The Departments responded to ACEP's transparency concerns with a non sequitur—the Departments asserted that "this [transparency] concern is addressed by our requirement that the amount be the greatest of the three amounts specified in" the regulation.  *Id*. at 72,213.  They also exacerbated the adverse impact of the Final

Rule on patients and ACEP's members by adding a provision stating that the minimum payment requirement does not apply in states that prohibit billing patients more than the amount covered by insurance ("balance billing").  *Id.*

7.      The stakes are extremely high for the nation's emergency physicians, including ACEP's members, and the patients that they serve.  As it stands now, the Departments have ensured that ACEP's members will be underpaid for out-of-network emergency services because insurers have proven by their past behavior that they will manipulate UCR amounts downward if given the chance.  Moreover, the Final Rule leaves ACEP's members who are out-of-network emergency physicians with no minimum payment protection in states that prohibit balance billing.  The viability of the practice of emergency medicine is at risk because many physicians will have no choice but to leave the practice of emergency medicine if they cannot receive fair payment for out-of-network services.

8.      When issuing the Final Rule, the Departments violated the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, because they did not consider and respond meaningfully to the concerns that ACEP presented.  The Departments' regulation is arbitrary, capricious, an abuse of discretion, and contrary to statutory law because it fails to ensure a reasonable payment for out-of-network emergency services as required by the ACA.  42 U.S.C. § 300gg-19a(b)(1)(C)(ii).

## II.      JURISDICTION AND VENUE

9.      ACEP brings this action under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA").

10.      This Court has jurisdiction under 28 U.S.C. § 1331 because all causes of action arise under the laws of the United States.

11.     Venue in this Court is proper under 28 U.S.C. § 1391(e)(1) because all Defendant Departments reside in the District of Columbia, and a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.

12.     This Complaint is timely under 28 U.S.C. § 2401(a).

### III.    PARTIES

13.     Plaintiff ACEP is a not-for-profit, voluntary professional association comprised of more than 34,000 emergency physicians, residents, and medical students.  ACEP is headquartered in Dallas, Texas and has an office in Washington, D.C.  One of ACEP's core purposes is to advocate for the interests of emergency physicians and their patients.  Among its many purposes, ACEP seeks to ensure that private and public health care payers provide patients and their emergency physicians with adequate and fair reimbursement for emergency services.

14.     Defendant Sylvia M. Burwell is the Secretary of the United States Department of Health and Human Services.  HHS established the Center for Consumer Information and Insurance Oversight ("CCIIO") within HHS's Centers for Medicare and Medicaid Services ("CMS") to help implement many of the ACA insurance reforms.   Defendant Thomas E. Perez is the Secretary of the United States Department of Labor.   Defendant Jacob J. Lew is the Secretary of the United States Department of the Treasury.  Defendants are the federal officers responsible for administering the ACA and oversee the Departments that issued the Final Rule. Defendants are sued in their official capacities.

### IV.    BACKGROUND

**A.     EMERGENCY MEDICAL SERVICES**

15.     Emergency physicians provide essential medical care to patients who present to the more than 4,400 hospital emergency departments nationwide.  Am. Hosp. Ass'n ("AHA"), *TrendWatch Chartbook 2015: Trends Affecting Hospitals and Health Systems*, A-28,

http://www.aha.org/research/reports/tw/chartbook/2015/15chartbook.pdf (last visited May 12,

2016).  In 2013, emergency physicians provided care in over 133 million visits.  *Id.*  In 88.5% of

emergency visits, the patients required immediate care and needed to be treated within at least

two hours, often much sooner.  AHA, *Always There, Ready to Care: The 24/7 Role of America's*

*Hospitals*, 4, http://www.aha.org/content/15/alwaysthere.pdf (last visited May 12, 2016).

Demand for emergency care rose approximately 30% from 2000 to 2013.  *Id.* at 6.  Only 31% of

emergency physicians are directly employed by hospitals.  Mktg. Gen. Inc., *2015 ACEP Poll*

*Affordable Care Act Research Results*, 7, http://newsroom.acep.org/download/2015+ACEP+

ACA+Poll+Report+FINAL.pdf (last visited May 12, 2016).  The remaining 69% provide

services under contract with a hospital, *id.*, and are paid by the patient or the patient's insurer.

More than one-third of emergency physicians report that they have considered leaving the

practice of medicine due to reductions in reimbursement for their services.  *Id.* at 16.

   16. Many health insurers create networks of health care providers in which the insurer

negotiates rates for particular services with providers in advance.  If a patient receives health care

from a provider in the network, the patient's out-of-pocket co-insurance will be less than if the

patient received care from a provider outside the insurer's network.  *See, e.g.*, Blue Cross Blue

Shield Blue Care Network of Michigan, *What's the Difference between In-Network and Out-of-*

*Network Benefits?*, http://www.bcbsm.com/index/health-insurance-help/faqs/topics/how-health-

insurance-works/difference-between-in-network-out-of-network-benefits.html (last visited May

12, 2016).

   17. A patient who requires emergency care is usually transported to the nearest

hospital emergency department to receive immediate care.  The patient will often be unconscious

or otherwise incapacitated.  Therefore, in most cases, the patient will not be able to choose an in-

network hospital for his or her care, and would almost never be able to ask for an in-network

emergency physician.  It is quite typical that a patient will present to an emergency provider that

is not in the patient's insurance network.  In this case, the emergency physician will be

reimbursed by the patient's insurer at the insurer's out-of-network rate.  The out-of-network rate,

as the name implies, is not negotiated in advance by the physician and the insurer.

**B.     STATUTORY REQUIREMENT TO PROVIDE EMERGENCY SERVICES**

18.     The federal Emergency Medical Treatment and Labor Act ("EMTALA") requires

emergency physicians to provide requisite care to individuals who come to the hospital

emergency department, regardless of the patient's ability to pay, if "a request is made on the

individual[s'] behalf for examination or treatment for a medical condition."  42 U.S.C.

§ 1395dd(a), (d)(1)(B) (2014).

19.     EMTALA requires that if a hospital participates in the Medicare program (which

includes virtually all hospitals) and has a hospital emergency department, the hospital must

provide an appropriate medical screening examination to determine whether an emergency

medical condition exists and provide, "within the staff and facilities available at the hospital,"

whatever treatment is necessary to stabilize the emergency medical condition.  42 U.S.C.

§§ 1395dd(a), (b), (e)(2).  These obligations apply to all patients who come to a participating

hospital seeking emergency care, not just those who are Medicare beneficiaries.  *Id.* § 1395dd(a).

Hospitals must provide the required screening and/or stabilization regardless of the "individual's

method of payment or insurance status."  *Id.* § 1395dd(h).

20.     EMTALA subjects emergency department physicians to a civil monetary penalty

of as much as $50,000 for failure to provide a patient with the required screening or stabilization

services.  *Id.* § 1395dd(d)(1)(B).

**C.      PRE-ACA PAYMENT FOR EMERGENCY SERVICES**

21.      Prior to 2010, health insurers generally set the out-of-network amount for
emergency services at the lesser of the physician's charge or a percentage of the UCR charge
amount for emergency services.  If the UCR charge amount was less than the physician's charge
for the out-of-network service, the physician was generally paid a percentage of the UCR charge
amount.

22.      Any difference between the physician's charge and the insurer's out-of-network
payment is often billed by the physician to the patient.  The practice of billing the patient for the
part of the bill not paid by insurance is known as "balance billing."  Some states have banned or
restricted balance billing.  *See, e.g.*, CAL. CODE REGS. tit. 28, § 1300.71(a)(3)(B) (2016); COLO
REV. STAT. § 10-16-704(3) (2015).  In states that prohibit balance billing for emergency services,
the emergency physician must accept the insurer's payment for out-of-network services as
payment in full, even if the payment falls well below the physician's charge.

23.      Insurers maintain industry databases of historical charges for health care services,
which are used to determine the UCR charge amounts.  Some insurers have manipulated these
databases to lower the UCR charge amount.  In 2009, the New York Attorney General conducted
an investigation of Ingenix, Inc., which maintained a database of UCR charge amounts used by
several large insurers to set out-of-network payments.  *See* Attorney General Eric T.
Schneiderman, *Attorney General Cuomo Announces Historic Nationwide Reform Of Consumer
Reimbursement System For Out-Of-Network Health Care Charges* (Oct. 27, 2009),
http://www.ag.ny.gov/press-release/attorney-general-cuomo-announces-historic-nationwide-
reform-consumer-reimbursement (last visited May 12, 2016).  Ingenix, Inc. was owned by
UnitedHealth, which is one of the nation's largest health insurers.  The New York Attorney
General found that Ingenix, Inc. fraudulently and intentionally used flawed data to lower UCR

charge amounts and to underpay for health care services. *Id.* The New York Attorney General entered into settlements with several health insurance companies that used the Ingenix database, including UnitedHealth and Aetna. *Id.*

24. As part of the settlements with the New York Attorney General's office, several insurance companies contributed approximately $100 million to fund the creation of FAIR Health, Inc., which is an independent not-for-profit corporation that administers a database of UCR charge amounts. *Id.* FAIR Health has stated that its data will be transparent, objectively validated, and available to the public. *Id.*

25. Not all U.S. insurers use the FAIR Health database to determine UCR charge amounts. Many insurers still determine UCR charge amounts using proprietary databases that are not subject to verification by emergency physicians or the public.

**D.    THE "GREATEST OF THREE" PAYMENT METHODOLOGY FOR OUT-OF-NETWORK EMERGENCY SERVICES**

26. On March 23, 2010, Congress enacted the ACA, which included broad reforms to the health insurance marketplace. One of the ACA reforms addresses health insurance coverage for emergency services. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10101(h), 124 Stat. 119, 888-90 (2010) (codified at 42 U.S.C. § 300gg-19a (2014)). If a participant in a health insurance plan receives emergency services from a provider that is not in the plan's network, the plan may not impose coverage limitations that are more restrictive than those applicable to in-network providers. 42 U.S.C. § 300gg-19a(b)(1)(C)(ii)(I). Moreover, "if such services are provided out-of-network, the cost-sharing requirement (expressed as a copayment amount or coinsurance rate) is the same requirement that would apply if such services were provided in-network." *Id*. § 300gg–19a(b)(1)(C)(ii)(II).

27. On June 28, 2010, the Departments issued an interim final rule with comment

period to implement the ACA out-of-network emergency provisions, among other topics.  Patient

Protection and Affordable Care Act: Preexisting Condition Exclusions, Lifetime and Annual

Limits, Rescissions, and Patient Protections, 75 Fed. Reg. 37,188 (June 28, 2010) (codified at 26

C.F.R. pt. 54; 29 C.F.R. pt. 2590; 45 C.F.R. pt. 147).  The Departments stated their interpretation

that the statute does not require insurers to pay any amounts that out-of-network providers

balance bill to patients (i.e., amounts billed for services that are not paid as covered services by

the payer or as cost-sharing by the patient).  *Id*. at 37,194 (citing Patient Protection and

Affordable Care Act, Pub. L. No. 111-148,  § 1302(c)(3)(B), 124 Stat. 119, 167 (2010) (codified

at 42 U.S.C. § 18022 (2014))).

28.     The Departments also interpreted the statute to require that a "reasonable amount

be paid before a patient becomes responsible for a balance billing amount," determined by "some

objective standard."  *Id*.  A reasonable payment is necessary because, otherwise, insurers might

establish extremely low payment rates for out-of-network emergency services, thus subjecting

patients to very high balance bills.  To address this concern, each of the three Departments issued

an identical regulation establishing the greatest-of-three methodology for determining payment

for out-of-network emergency services.  Specifically, if an insurer provides coverage of

emergency services, it must pay for out-of-network emergency services at the greatest of the

following three amounts:

(A) The amount negotiated with in-network providers for the emergency
service furnished, excluding any in-network copayment or coinsurance imposed
with respect to the participant, beneficiary, or enrollee. . . .

(B) The amount for the emergency service calculated using the same method
the plan generally uses to determine payments for out-of-network services (such
as the usual, customary, and reasonable amount), excluding any in-network
copayment or coinsurance imposed with respect to the participant, beneficiary, or
enrollee. . . .

(C) The amount that would be paid under Medicare (part A or part B of title
XVIII of the Social Security Act, 42 U.S.C. 1395 *et seq*.) for the emergency

service, excluding any in-network copayment or coinsurance imposed with
respect to the participant, beneficiary, or enrollee.

26 C.F.R. § 54.9815–2719AT(b)(3); 29 C.F.R. § 2590.715–2719A(b)(3); 45 C.F.R. §

147.138(b)(3).

29.     In the preamble to the interim final rule, the Departments described the second of

the above three amounts to include "the usual, customary, and reasonable *charges*."  Patient

Protection and Affordable Care Act, 75 Fed. Reg. at 37,194–95 (emphasis added).

30.     The in-network amounts for emergency services described at 26 C.F.R. §

54.9815–2719AT(b)(3)(i)(A), 29 C.F.R. § 2590.715–2719A(b)(3)(i)(A), and 45 C.F.R.

§ 147.138(b)(3)(i)(A) are established in contracts between health insurers and health care

providers that agree to participate in the insurers' networks.  The in-network amounts are

generally not publicly available.  The in-network amount for emergency services is almost

always lower than the UCR charge amount for emergency services described at 26 C.F.R.

§ 54.9815–2719AT(b)(3)(i)(B), 29 C.F.R. § 2590.715–2719A(b)(3)(i)(B), and 45 C.F.R. §

147.138(b)(3)(i)(B).

31.     The Medicare amount for emergency services described at 26 C.F.R. § 54.9815–

2719AT(b)(3)(i)(C), 29 C.F.R. § 2590.715–2719A(b)(3)(i)(C), and 45 C.F.R. §

147.138(b)(3)(i)(C) is generally lower than either the in-network amount at 26 C.F.R. § 54.9815–

2719AT(b)(3)(i)(A), 29 C.F.R. § 2590.715–2719A(b)(3)(i)(A), and 45 C.F.R.

§ 147.138(b)(3)(i)(A) or the UCR amount at 26 C.F.R. § 54.9815–2719AT(b)(3)(i)(B), 29 C.F.R.

§ 2590.715–2719A(b)(3)(i)(B), and 45 C.F.R. § 147.138(b)(3)(i)(B).

32.     ACEP submitted a comment letter dated August 3, 2010 to the Departments in

response to the interim final rule.  ACEP was concerned that the Departments did not establish a

means for verifying, and therefore establishing, an objective standard for the UCR amount

described in the second of the greatest-of-three payments. Thus, that amount might be understated by payers, improperly reducing the greatest-of-three calculation. ACEP proposed the development of a database of common charges and/or costs for specific procedures that would be transparent and monitored by state and federal insurance officials. ACEP suggested that the FAIR Health database, which was then under development, could be used to determine UCR amounts. ACEP also requested that the Departments impose uniform national standards for out-of-network emergency services by applying the greatest-of-three methodology in states that prohibit or limit balance billing.

33.     On September 20, 2010, DOL issued guidance on the applicability of the regulations governing out-of-network emergency services in states that prohibit balance billing for emergency services. DOL's guidance states that "if a State law prohibits balance billing, plans and issuers are not required to satisfy the payment minimums set forth in the regulations." Dep't of Labor, *FAQs About the Affordable Care Act Implementation Part I* (Sept. 20, 2010), http://www.dol.gov/ebsa/faqs/faq-aca.html (last visited May 12, 2016).

34.     ACEP expressed its concerns to CCIIO several times over the next five years. On May 7, 2012, ACEP met with CCIIO representatives and requested that the Departments publish guidance to require that insurers use objective standards when determining UCR amounts. On June 8, 2012, ACEP sent a memorandum to CCIIO summarizing the concerns that ACEP expressed in the May 7, 2012 meeting. In the June 8, 2012 memorandum, ACEP proposed frequently asked questions ("FAQs") for CCIIO's consideration. One of ACEP's proposed FAQs would have required insurers to use transparent, verifiable data to determine UCR charge amounts:

> When determining the benefit provided under the second standard in the "greatest of 3" language, issuers should utilize a database of usual and customary charges

which meets requirements which ensure the accuracy of the non-participating, commercially insured claims data used to calculate these usual and customary charges. These features include transparency, currency, statistical validity, protections against conflict of interest, and certification by an independent auditor. This database should be made available to the issuers, providers, and the public though an independent  third-party organization.

CCIIO did not respond to ACEP's June 8, 2012 memorandum.

35.     On June 11, 2013, ACEP wrote another memorandum to officials at CCIIO and CMS regarding the ACA's out-of-network coverage rules for emergency services.  ACEP stated that most insurers use UCR charge amounts to determine payment rates for out-of-network emergency services.  ACEP requested that CMS and DOL "provide guidance to issuers clarifying that <u>objective</u> standards must be transparent and verifiable by a third party—not under the control of the insurer."  ACEP requested that the Departments apply the payment standards for out-of-network emergency services in states that ban balance billing.  Neither CCIIO nor CMS responded to ACEP's June 11, 2013 memorandum.

36.     On December 11, 2014, ACEP again wrote to CCIIO and requested that it establish practical guidance explaining how insures should comply with the greatest-of-three regulation.  ACEP stated that it was imperative to establish a methodology for determining the reasonable market value of emergency services.  CCIIO did not respond to ACEP's December 11, 2014 letter.

37.     The Departments finalized the greatest-of-three regulation on November 18, 2015.  Final Rules for Grandfathered Plans, Preexisting Condition Exclusions, Lifetime and Annual Limits, Rescissions, Dependent Coverage, Appeals, and Patient Protections Under the Affordable Care Act, 80 Fed. Reg. 72,192 (Nov. 18, 2015) (codified at 26 C.F.R. pt. 54; 29 C.F.R. pt. 2590; 45 C.F.R. pt. 147).  The Departments did not revise the greatest-of-three methodology.  26 C.F.R. § 54.9815–2719A(b)(3); 29 C.F.R. § 2590.715–2719A(b)(3); 45 C.F.R.

§ 147.138(b)(3).  The Departments issued only one response to comments on the greatest-of-three methodology:

> Some commenters expressed concern about the level of payment for out-of-network emergency services and urged the Departments to require plans and issuers to use a transparent database to determine out-of-network amounts. The Departments believe that this concern is addressed by our requirement that the amount be the greatest of the three amounts specified in paragraphs (b)(3)(i)(A), (b)(3)(i)(B), and (b)(3)(i)(C) of this section (which are adjusted for in-network cost-sharing requirements).

*Id*. at 72,213.  The Departments did not explain how the greatest-of-three methodology would address transparency and accuracy concerns with UCR amounts.

38.     The preamble to the Final Rule described the second of the greatest-of-three amounts as "the usual, customary, and reasonable *amount*."  *Id.* (emphasis added).  This description was a departure from the preamble to the interim final rule, which described the second of the greatest-of-three amounts as "the usual, customary, and reasonable *charges*."  Patient Protection and Affordable Care Act, 75 Fed. Reg. at 37,194 (emphasis added).  The Departments did not explain why they changed the description of the second of the greatest-of-three amounts.

39.     In the Final Rule, the Departments amended the regulation to state that the minimum payments for out-of-network emergency services do not apply in states that prohibit balance billing or if the insurer is contractually obligated to pay the balance bill.  Final Rules for Grandfathered Plans, 80 Fed. Reg. at 72,213 (codified at 45 C.F.R. § 147.138(b)(3)(iii)).

40.     On April 20, 2016, DOL issued an FAQ addressing whether insurers must disclose "the method the plan or issuer generally uses to determine payments for out-of-network services (e.g., the UCR amount)."  Dep't of Labor, *FAQs about Affordable Care Act Implementation (Part 31)*, https://www.dol.gov/ebsa/faqs/faq-aca31.html (last visited May 12, 2016).  The DOL FAQ answered, "Yes."  DOL cited two sets of authorities for this answer:  1)

ERISA § 104(b) and the ERISA regulation at 29 C.F.R. § 2520.104b-1; and 2) internal claims and appeals regulations at 26 C.F.R. § 54.9815-2719, 29 C.F.R. §§ 2560.503-1, 2590.715-2719, and 45 C.F.R. § 147.136.

41.     ERISA § 104(b) entitles plan participants and beneficiaries to obtain, upon written request, "other instruments under which the plan is established or operated" from health benefit plans covered by ERISA.  29 U.S.C. § 1024(b)(4).  ERISA § 104(b) and 29 C.F.R. § 2520.104b-1 do not entitle physicians to obtain this information.

42.     The regulations at 26 C.F.R. § 54.9815-2719, 29 C.F.R. § 2590.715-2719, and 45 C.F.R. § 147.136 incorporate the regulation at 29 C.F.R. § 2560.503-1.  These regulations enable a physician who provides urgent care, acting as the patient's authorized representative, to file an appeal with the insurance plan of an adverse benefit determination.  29 C.F.R. §§ 2560.503-1, 2590.715-2719(b); 26 C.F.R. § 54.9815-2719(b); 45 C.F.R. § 147.136(b).  Once the appeal is pending, the physician and/or patient may receive "relevant" information on the claim.  29 C.F.R. § 2560.521-1(h)(2)(iii); *see also* 26 C.F.R. § 54.9815-2719(b)(2)(ii)(C) (incorporating 29 C.F.R. § 2560.521-1(h)(2)); 29 C.F.R. § 2590.715-2719(b)(2)(ii)(C) (same); 45 C.F.R § 147.136(b)(2)(ii)(C), (b)(3)(ii)(C) (same).

43.     The regulations at 26 C.F.R. § 54.9815-2719, 29 C.F.R. §§ 2560.503-1, 2590.715-2719, and 45 C.F.R. § 147.136 will not provide emergency physicians with a transparent, publicly verifiable database of UCR amounts.  At best, the regulations may provide physicians who appeal adverse benefit determinations with the three amounts specified in the greatest-of-three regulation for the particular claim under appeal.  The regulations do not entitle emergency physicians to the information necessary to verify the accuracy of those amounts.

44.     The Final Rule ensures that many of ACEP's member physicians will not receive

a "reasonable amount" for services, determined by "some objective standard."  Final Rules for

Grandfathered Plans, 80 Fed. Reg. at 72,213.  The Medicare amount is the only one of the

greatest-of-three amounts that is always publicly available, and it is typically the lowest of the

three amounts.  The in-network amount is proprietary, not publicly available, and is generally

lower than the UCR amount.  The UCR amount will usually be the greatest of the three amounts.

The New York Attorney General's investigation of Ingenix, Inc. demonstrates that insurers have

a track record of improperly and inaccurately manipulating the UCR amounts downward unless

the UCR amounts are publicly available and subject to verification.

45.     The Final Rule also ensures that many of ACEP's member physicians will not

receive a "reasonable amount" for services, determined by "some objective standard," *id.*,

because the Departments eliminated clarifying language from the interim final rule that linked

the UCR amount to UCR charges.  *Id.*  The Departments have failed to define the specific type of

amount that will be considered "usual, customary, and reasonable."   The change from "charges"

to "amount" means that ACEP's members will not be able to determine whether insurers are

calculating the UCR amount based on charges, prior payments, or some other metric.  The New

York Attorney General's investigation of Ingenix, Inc. demonstrates that insurers will

manipulate the UCR amount downward unless standards based on existing *charges* or some

other objective benchmark are established for determining the UCR amount.

46.     EMTALA requires emergency physicians to treat patients with emergency

medical conditions without regard to their ability to pay for emergency services.  42 U.S.C. §

1395dd(b), (d)(1)(B).  Many insured patients are unable or unwilling to pay balance bills.  When

balance bills are not paid, ACEP's member physicians will only receive payments from insurers

that are calculated using the greatest-of-three methodology.  These payments will be reduced by

undefined and inaccurate UCR data.  Because the Departments have not subjected the UCR

amounts to public verification, ACEP's member physicians will receive less than a "reasonable

amount" for services, determined by "some objective standard."  Final Rules for Grandfathered

Plans, 80 Fed. Reg. at 72,213.  Because the Departments have not defined the UCR amount,

ACEP's members will receive less than a "reasonable amount" for services," determined by

"some objective standard."  *Id*.

47.     The adverse impact of the Final Rule is even greater in states that prohibit balance

billing because the Final Rule eliminates the minimum payment requirement in those

jurisdictions, leaving ACEP's members who are out-of-network emergency physicians with no

payment protection under the regulation.

48.     Because the Departments have not subjected the UCR amounts to verification,

many patients who do pay their balance bills will pay amounts that should have been paid by

insurers if the insurers had correctly determined the UCR amounts.  As a result, these patients

will have unequal access to out-of-network emergency medical services and will bear an unequal

cost sharing burden for such services in violation of the ACA.

## COUNT I
## ARBITRARY AND CAPRICIOUS AGENCY ACTION

49.     Plaintiff realleges and incorporates by reference paragraphs 1-48 as if fully set

forth below.

50.     The New York Attorney General's action against Ingenix, Inc. and the insurance

companies that used the faulty and fraudulent Ingenix database demonstrates that UCR amounts

must be defined and subject to verification.  The Departments failed to respond meaningfully to

ACEP's concern that insurers should be required to use a transparent database to determine out-

of-network UCR payments to emergency physicians.  The Departments did not meaningfully

consider "the relevant matter presented."  5 U.S.C. § 553(c).  The Departments' action is

"without observance of procedure required by law," is arbitrary, capricious, and otherwise

contrary to law, and is, therefore, invalid.  *Id.* § 706.

## COUNT II
## THE AGENCIES' REGULATION AT 45 C.F.R. § 147.138(b)(3) IS UNLAWFUL AND INVALID

51.     Plaintiff realleges and incorporates by reference paragraphs 1-48 as if fully set

forth below.

52.     The statutory provision at 42 U.S.C. § 300gg-19a requires that insurers pay a

reasonable amount for emergency services, determined by an objective standard.  Final Rules for

Grandfathered Plans, 80 Fed. Reg. at 72,213.  The Departments' regulation at 26 C.F.R.

§ 54.9815–2719A(b)(3),  29 C.F.R. § 2590.715–2719A(b)(3), and 45 C.F.R. § 147.138(b)(3)

fails to set an objective standard for reasonable payments, as required by the ACA, because the

regulation does not require the establishment of a transparent, verifiable database for

determination of UCR amounts.  The Departments' regulation at 26 C.F.R. § 54.9815–

2719A(b)(3), 29 C.F.R. § 2590.715–2719A(b)(3), and 45 C.F.R. § 147.138(b)(3) fails to set an

objective standard for reasonable payments, as required by the ACA, because the regulation does

not define the UCR  amount.  The Departments' regulation at 26 C.F.R. § 54.9815–2719A(b)(3),

29 C.F.R. § 2590.715–2719A(b)(3), and 45 C.F.R. § 147.138(b)(3) also fails to set an objective

standard for reasonable payments, as required by the ACA, because it exempts insurers from the

minimum payment standards in states that prohibit balance billing.  The regulation at 26 C.F.R.

§ 54.9815–2719A(b)(3), 29 C.F.R. § 2590.715–2719A(b)(3), and 45 C.F.R. § 147.138(b)(3) is,

therefore, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

5 U.S.C. § 706.

18

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff respectfully requests relief as follows:

1.      A declaration by the Court that the Departments promulgated the regulations at 26 C.F.R. § 54.9815–2719A(b)(3), 29 C.F.R. § 2590.715–2719A(b)(3), and 45 C.F.R. § 147.138(b)(3) without observance of procedure required by law, and the regulations are, therefore, invalid.

2.      A declaration by the Court that the Departments' regulations at 26 C.F.R. § 54.9815–2719A(b)(3), 29 C.F.R. § 2590.715–2719A(b)(3), and 45 C.F.R. § 147.138(b)(3) are arbitrary, capricious, an abuse of discretion, and contrary to statutory law, and are, therefore, invalid.

3.      An order from this Court invalidating the regulations at 26 C.F.R. § 54.9815–2719A(b)(3), 29 C.F.R. § 2590.715–2719A(b)(3), and 45 C.F.R. § 147.138(b)(3) and enjoining their implementation.

4.      An order from this Court awarding Plaintiff the costs and fees incurred in this litigation and granting such other relief in law and/or equity as this Court may deem just and proper.


Respectfully submitted,

Ronald S. Connelly
POWERS PYLES SUTTER &
VERVILLE, PC
1501 M Street, N.W.
Seventh Floor
Washington, DC 20005
tel. (202) 872-6762
fax (202) 785-1756


  /s/ Ronald S. Connelly

Ronald S. Connelly
D.C. Bar No. 488298

Attorney for Plaintiff, the American College of
Emergency Physicians

Dated:  May 12, 2016